# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 11, 2003 Session

## ROBERT M. OVERHOLT, M.D., ET AL. v. HUGH RAY WILSON

**Appeal from the Chancery Court for Knox County**
**No. 140274-2     Daryl Fansler, Chancellor**

 **FILED MARCH 14, 2003** 

## No. E2002-01479-COA-R3-CV

In this suit, Plaintiffs Robert M. Overholt, Joe W. Black, and Michael D. Price sue Defendant Hugh Ray Wilson, seeking possession of a portrait of long-time University of Tennessee football coach, General Robert R. Neyland. The suit also sought injunctive relief as to a proposed sale of the portrait by Mr. Wilson in connection with a bankruptcy sale of assets of a corporation owned by him. Mr. Wilson's sole defense of the suit was that it was barred by T.C.A. 28-3-105(2), the three-year statute of limitations for recovery of personal property. The Trial Court submitted to the jury a single question regarding the only material factual dispute, and upon receipt of the jury's finding held that the statute of limitations was not a viable defense and granted judgment in favor of the Plaintiffs. Mr. Wilson appeals and raises four issues, hereinafter set out, for our consideration. We find that they are without merit and affirm.

### Tenn.R.App.P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Cause Remanded

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

David S. Wigler, Knoxville, Tennessee, for the Appellant, Hugh Ray Wilson

Timothy E. Irwin, Knoxville, Tennessee, for the Appellees, Robert M. Overholt, M.D., Joe W. Black, M.D., and Michael D. Price

### OPINION

Mr. Wilson's issues are the following:

I.      Whether the trial court erred as a matter of law in concluding that this action was commenced within the applicable statute of limitation.

II.      Whether the trial court erred in formulating the jury interrogatory.

III.     Whether the trial court abused its discretion in overruling Defendant's objection to hearsay testimony of attorney Ed Cox.

IV.     Whether the trial court abused its discretion in permitting improper cross examination of Appellant about the legal effect of a stipulation, or whether the judgment should be reversed to avoid "prejudice to the judicial process."

Prior to the opening statements, the Trial Court advised the jury of the following stipulation:

> All right. Ladies and gentlemen of the jury, the lawyers are going to give you their opening statements at this time. Prior to that I want to read again the stipulations or facts to which they have agreed in this case.
>
> It is agreed that the plaintiffs who are here are the proper parties to this suit and adequately represent any ownership rights which a corporation known as Football Memories, Incorporated, may or may not have in this lawsuit or in the painting.
>
> It is also stipulated that the plaintiffs commissioned the painting and allowed it to be hung at the University of Tennessee but never granted any ownership interest in the painting to any person at the University of Tennessee or to the University of Tennessee itself.
>
> They have further stipulated that the only question of fact remaining is whether the Plaintiffs' claim is barred by the statute of limitations in this case. That is the legal issue that I told you about. There are certain time limits that are applicable here. You will make a decision regarding this conversation back in 1993 and then, based upon your findings of fact, the Court will apply the law to determine whether or not the Plaintiffs' claim is barred by time or is not.

This was a jury trial insofar as the facts surrounding a certain telephone conversation between Dr. Overholt and Mr. Wilson. Because the verdict of the jury was approved by the Trial Court, our standard of review is whether there is material evidence to support the jury's finding of fact. Tenn. R. App. P. 13(d); *Moss v. Sankey*, 54 S.W.3d 296 (Tenn. Ct. App. 2001).

We will accept as true the Appellants' statement of facts as to the events leading to the disputed telephone conversation:

> Dr. Overholt is a well-known Knoxville physician employed at the Allergy, Asthma and Sinus Center. He attended the University of Tennessee in

1959 through 1962 and played football for General Neyland. Johnny Majors was a teammate of his and also a fraternity brother.

Dr. Overholt commissioned three Paintings commemorating U.T. football events from artist Ron Villani, and made prints of the Paintings. The Paintings were called *The General, The Stop*[1] and *The Run*.[2] After Johnny Majors returned to the University of Tennessee, he and Overholt remained social friends. Dr. Overholt offered *The General* (hereinafter the "Painting") to Majors for display in his office and had it delivered to the University of Tennessee.

Hugh Ray Wilson spent most of his adult life as a manufacturer's representative for several sporting goods lines. As a sales rep, Wilson would visit athletic departments at universities, including the University of Tennessee. As far back as he can remember he started collecting memorabilia with the intention of opening a sports bar.

In approximately 1989, on one of his calls to the University of Tennessee, Appellant Wilson became aware of a large storage area that the fire marshal had given U.T. an ultimatum to empty. Wilson was taken down and shown this area and to this delight, there were quite a few things that he felt he would like to have. Appellant Wilson entered into an agreement with the University to furnish the labor and everything involved in cleaning out the area, in return for keeping what he didn't carry to the dump or dispose of. Wilson incurred expenses for removing and cleaning this area, in that he paid some help and had dumping expenses. It took two days to clean out the room.

Appellant Wilson opened Hooray's Sports Bar and Grill in 1991, and moved the Painting to that location. The Painting hung in a prominent place in plain view to the public at Hooray's. The Painting was a focal point of the upstairs room and was hanging right behind a baby grand piano right next to the entrance doors to the area.

Over the years, Hooray's held special functions for the U.T. athletic department on a regular basis. Coach Majors and other members of the Athletic Department came into this room where the Painting was hanging. Nobody ever asked for the Painting back before this lawsuit was brought. Nobody from U.T.

---

[1]    Dr. Overholt described *The Stop* as "Billy McCannon being stopped when he played for L.S.U." We suspect this is a typographical error and that the correct name of the L.S.U. player was Billy Cannon.

[2]    Dr. Overholt described *The Run* as "Johnny Butler running against Alabama in 1929." We also suspect this is a typographical error in that the correct year was 1939.

ever asked Appellant Wilson how he got it. Two of the Plaintiffs, Mr. Price and Dr. Black also visited the Bar and never asked for the Painting back. When Coach Majors left the University in 1992 Dr. Overholt went to search for the Painting at U.T. on two or three different occasions, trying to find the Painting. When he finally located the Painting at Hooray's in 1993, Overholt decided he had two alternatives. Number one was to try to get the picture back from Appellant Wilson, and number two was to seek legal advice and go about it the way that it is legally correct. Dr. Overholt decided to seek legal advice from Attorney Ed Cox.

As recognized by the Court in its charge to the jury, the critical issue is whether Dr. Overholt or Mr. Wilson accurately detailed their telephone conversation.

### Dr. Overholt's Testimony Relative to the Telephone Conversation

A.      Yes, Joe Black said, "You need to go talk to an attorney. It's very important that you do things legally."

Q.      What did you do next?

A.      I talked with Mr. Ed Cox, an attorney at that time. I explained the situation to Mr. Cox. I told him that the picture had finally been found.

        You have to realize that we had been searching for this for a long period of time. I told him that I wanted to go about it the right way of getting the picture back in our hands. Mr. Cox said, "I will write a letter to Mr. Wilson and I think it would be a good idea if you called Mr. Wilson also."

Q.      Did you call?

A.      I called Hugh Ray Wilson the next day.

Q       Did you reach Mr. Wilson?

A.      Yes, I did.

Q.      Did you identify yourself?

A.      Yes, I did. I told him I was Dr. Robert Overholt.

Q       Did he question that you were Dr. Robert Overholt?

A.      No.

Q. What did you tell Mr. Wilson?

A. I told Mr. Wilson that I saw the picture in the newspaper and the painting of The General was a painting that Football Memories had commissioned and that it was ours, Mike Price, Joe Black and maybe Joe Thompson and maybe my children, that it was the corporation's picture and that we were the owners of that.

At that time Mr. Wilson stated, "Please, please don't take that picture." He said, "That picture is part of my business. It's part of my life. It's part of everything that I do. You can't take that picture from me. I need that picture. I've got a special room for it. The room is where we have special parties. It's in a room called The General. Please don't take that picture from us."

Q. Did you respond?

A. Yes, I did. I told him the picture was ours and I would have to go back and explain his desires to the other owners to see if they would acquiesce to that or see if they wanted the picture back in their hands.

I talked to Joe Black. I told Joe Black then that Mr. Wilson had it in a special place in an establishment, that we had no place for that picture, that we had no specific plans at that time for that picture other than to increase its awareness and I thought it would be perfectly acceptable to allow him to keep the picture, to display the picture at the Hooray's establishment.

Joe Black disagreed. He said we needed to get that picture back in our hands and not let anyone else have it, but he said he would acquiesce to my feelings that it should be allowed to hang there.

### Mr. Wilson's Testimony Relative to the Telephone Conversation

Q. What was the first communication you had from Dr. Overholt about the painting?

A. I got a phone call and he said his name was Dr. Overholt, that I had an oil painting that belonged to him of General Neyland. I told him I can't have an oil painting that belonged to him period, that I had an oil painting. I explained to him how I got it, how I came by it.

I was adamant. I didn't beg anyone or anything. I was adamant. I explained to him how I came by it, just as I explained it to you, the exact same description and so forth. That hasn't changed since that day.

Q. Did you tell him that you owned the painting?

A. Without any question, yes, sir.

With regard to the first issue on appeal, the Trial Court submitted the following interrogatory to the jury:

> The questions that you will be asked to decide in this case, ladies and gentlemen, is this: "Did Dr. Overholt, after the telephone conversation with Mr. Wilson in 1993, know or should he have known that Mr. Wilson intended to claim the Painting as his and hold it against the claims of ownership by Dr. Overholt?"

The jury answered this question in the negative, having obviously found that Dr. Overholt consented for Mr. Wilson to keep the painting in his Sports Bar in accordance with his fervent entreaty. We find this determination especially appropriate when Dr. Black, one of the owners of the paintings, insisted when the portrait was found that the owners should proceed immediately to reclaim it, but was persuaded by Dr. Overholt to permit it to stay with Mr. Wilson. Thus, the Plaintiffs did not know that Mr. Wilson was claiming ownership of the painting until they learned it was to be auctioned, which prompted the complaint in this case.

We are convinced beyond peradventure that had Mr. Wilson in fact asserted ownership of the painting in the telephone conversation with Dr. Overholt, a suit would have been initiated within days thereafter.

We conclude as to the first issue, that there is material evidence to support the jury's verdict and the Court's determination based thereon, that the Statute of Limitations was not a bar.

As to the second issue, counsel for Mr. Wilson contends that the question was inappropriate and the Trial Court should have posed the following two questions that he proposed. It will be noted that the question put by the Trial Court is substantially the same as the second one suggested by counsel.

> 1. During the conversation between Dr. Overholt and Mr. Wilson in 1993, did Mr. Wilson acknowledge or admit that Dr. Overholt owned the Painting? _____ (yes) _____ (no)
>
> 2. Did Dr. Overholt know, or should he reasonably have known, that a cause of action against Mr. Wilson existed in 1993? _____ (yes) _____ (no)

As to the first question, it is not of any great significance whether Mr. Wilson acknowledged the ownership by Dr. Overholt, but it is clear that under the stipulation Mr. Wilson did not own the painting. Moreover, it may clearly be inferred if Dr. Overholt's testimony is accredited, that ownership by the Plaintiffs was at least tacitly acknowledged by Mr. Wilson.

As to the third issue, Mr. Wilson contends that the testimony of Dr. Overholt's first attorney was improperly admitted as hearsay:

> Q. Was it your understanding, prior to sending that letter, that your client and the Defendant had talked prior to that time?
>
> MR. WIGLER: Objection, Your Honor. That is covered by -
>
> THE COURT: Overruled.
>
> A. I don't know. I knew that at least sometime around the mailing of the letter. I'm not sure, Mr. Irwin, if it was before or after, but I knew sometime around the mailing of the letter that Dr. Overholt had spoken to Mr. Wilson.
>
> Q. After sending that initial letter, do you remember taking any further action with regard to the Painting, The General?
>
> A. No sir. I do not.
>
> Q. Why not?
>
> A. Because I did not feel it was necessary, that <u>there was no dispute as to who owned the Painting</u>; therefore, there wasn't anything else to be done based on the facts as I knew them. (Emphasis in Mr. Wilson's brief.)

In the first place, we question whether the answers of Mr. Cox were inadmissible as hearsay. All he was testifying to is that it was his understanding that there was no dispute as to the ownership of the painting. We believe he was entitled to explain the reason he did not take further action whether his understanding was true or not.

Relative to the fourth issue, that it appears that counsel for the Plaintiffs spent an undue amount of time questioning Mr. Wilson regarding his testimony–even to the very end of trial–that he owned the paintings in contradiction of his stipulation. We do not believe, however, any error in allowing extensive cross-examination in regard thereto, "more likely than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(a). Moreover, it does not appear that counsel for Mr. Wilson moved for a mistrial based upon the extended cross-examination of Mr. Wilson regarding his testimony, *vis-a-vis* the stipulation.

In conclusion, we point out that even had Mr. Wilson been successful in this suit, ownership of the painting would remain in the Plaintiffs. They, however, would be barred by the applicable Statute of Limitations from asserting their ownership.

For the foregoing reasons the judgment of the Trial Court is affirmed and the cause remanded for such further proceedings, if any, as may be necessary. Costs of appeal are adjudged against Hugh Ray Wilson and his surety.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE